UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UROLOGIX, INC.,

       Plaintiff,

v.                           Case No. 8:08-cv-669-T-30MAP

MICHAEL WOOD
and JOSE BOSQUE,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff, Urologix, Inc., moves to preliminarily enjoin their former employees, Michael

Wood and Jose Bosque from breaching their employment agreements covering non-competition,

confidential information and return of tangible items ("Employment Agreements") and

committing fraud.  After a hearing on the matter, I find Urologix has satisfied the requirements

for issuance of a preliminary injunction and recommend the district judge grant Urologix's

motion for preliminary injunction (doc. 7).[1]

*A.  Facts*

Urologix develops, manufactures, and markets medical devices for the treatment of

urological disorders.  Specifically, Urologix has developed a patented microwave technology

called Cooled ThermoTherapy used to treat men with a condition known as benign prostatic

hyperplasia (BPH), or an enlarged prostate.  In conjunction with its technology, Urologix

manufactures a portable machine called the "CoolWave," similar to its predecessor machine

_____

[1]   The district judge referred this matter to me for issuance of a Report and
Recommendation as to the appropriate disposition of the motion pursuant to 28 U.S.C. § 636
(doc. 11).

known as the "Targis."  When using the CoolWave machine, physicians insert a disposable

catheter into the patient's prostatic urethra and then monitor the patient, occasionally

with the assistance of an Urologix representative, known as an Application Specialist or mobile

technician, who operates and monitors the CoolWave machine during the procedure.  Urologix

obtains revenue from selling the CoolWave to physicians, entering into Long Term Per-

Procedure agreements with physicians, selling disposable catheter kits to physicians, and

providing use of a control unit, treatment catheters, and technical assistance on a mobile per-

procedure basis (doc. 8, Doerfert Declaration ¶¶ 5-7).  Urologix does not use radio frequency

technology and does not perform surgery (Wood Aff. ¶ 3).

In developing its business, Urologix devotes time and effort to the development and

maintenance of information about its customers, business relationships, products and services,

and other business information (doc. 8, Doerfert Declaration ¶ 12).  As part of their employment

with Urologix, employees become privy to customer information including the type and monthly

procedure volume for each customer, pricing for each customer, revenue and profit margins for

each customer, treatment schedules for each physician's office, and each physician's preferences

as to treatment of the physician's patients with the Cooled ThermoTherapy (doc. 8, Doerfert

Declaration ¶ 15; Schimmel Declaration ¶ 13).  To ensure this information remains confidential,

Urologix devotes a section in its employment agreements to prohibiting the use or disclosure of

"Confidential Information"[2] and does not release that information to competitors or the general

---

[2]  "Confidential information" is defined in the Employment Agreements as "information not generally known, including trade secrets, about methods, processes, products, and relationships of Urologix, including but not limited to, compilations of information, information relating to such matters as computer software and hardware technology, research and development, engineering, manufacturing methods, processes, techniques, chemical composition

public.

Urologix hired Wood as a Territory Sales Manager on September 6, 2005.  Wood's responsibilities included selling CoolWave and Targis machines, selling disposable catheter kits and providing technical assistance to physicians as needed (doc. 8, Doerfert Declaration ¶ 8). Wood's territory included only West Florida until June 2006.  From June 2006 until January 2008, Wood's territory became the State of Florida, excluding the panhandle.  After January 2008, Wood's territory included parts of Central Florida and North Florida (doc. 24, Wood Aff. ¶ 5).

Urologix hired Bosque as an Application Specialist on April 28, 2006.  His responsibilities included driving a company van containing Urologix equipment and supplies to customer sites, managing the equipment through patient treatments, and completing treatment records, which physicians would sign and Bosque would forward to Urologix on a daily basis for customer invoicing.  His territory included the State of Florida and South Georgia (doc. 8, Doerfert Declaration ¶ 11).

Contemporaneous with the commencement of their employment, both Wood and Bosque signed Employment Agreements with Urologix.  In their Employment Agreements, Wood and Bosque agreed to numerous terms of employment including provisions addressing confidentiality, non-competition and the return of tangible items upon termination of employment (doc. 8, Doerfert Declaration, Exh. 1, 2 pp. 3-5).

---

of materials, applications for particular technologies, materials or designs, vendor names, customer lists, management systems, and sales and marketing plans.  All information disclosed to Employee or to which Employee has access during his/her employment which he/she has a reasonable basis to believe is Confidential Information or which is treated by Urologix as Confidential Information, shall be presumed to be Confidential Information."

In approximately November of 2007, Urologix began discussions with Wood to allow him to work as an independent contractor of Urologix (doc. 24, Wood Aff. ¶ 6). In an e-mail dated December 13, 2007, Jason Schimmel, Urologix's Eastern Regional Sales Director, expressed concerns regarding the stability of the Florida territory and expectations regarding sales goals required of Wood before Urologix would move forward with Wood becoming an independent contractor for Urologix (doc. 24, Wood Aff., Comp. Exh. A). In another e-mail dated December 21, 2007, Schimmel informed Wood that the possibility of Wood becoming an independent contractor could not be addressed until after the first of the year (*Id.*). In the end, Urologix and Wood could not agree to the terms of an independent contractor agreement, so Wood did not become an independent contractor of Urologix (doc. 24, Wood Aff. ¶ 6). Instead, Wood resigned from Urologix effective February 19, 2008 (*Id.*).

While still employed by Urologix, Wood organized a business called Premier Medical Consultants ("Premier"). Initially, Wood planned to establish Premier as the company with which he would enter into an independent contractor agreement with Urologix (doc. 24, Wood Aff. ¶ 6). However, when the discussions regarding an independent contractor agreement failed, Wood continued with the establishment of Premier as a business that provides treatment for BPH through microwave therapy (using Urologix's CoolWave machine and catheters), radio frequency therapy, and laser surgery (*Id.* at ¶ 9). Premier utilized a business plan expressly stating Premier's intent of "converting current Urologix customers"[3] (doc. 8, Doerfert

---

[3] Urologix obtained the business plan and numerous other files from Wood's and Bosque's computers with the assistance of Information Technology Specialist Brett Yerks. After removing the hard drives and obtaining the deleted files using a software program entitled "GetDataBack," the hard drives were shipped to Kroll Ontrack for forensic analysis, which Christopher Andrews performed and noted the deletion and destruction of files. (doc. 8, Yerks

Declaration, Exh. 7, p. 11).  Additionally, one of Wood's motivations for pursuing this business was "to secure my future and fulfill a lifelong dream of building a successful business, while helping others to succeed and benefit from my many years of educational/management preparation, extensive professional contacts, and strong business relationships" (doc. 8, Doerfert Declaration, Exh. 7, p. 7).  Indeed, Bosque invested $20,000 in Premier for a 50% stake of the new company (doc. 18, Bosque Aff. ¶ 2 and Exh. A).

Both Wood and Bosque, while still employed with Urologix, advanced Premier's position.  For example, Wood and Bosque invoiced Urologix customers on Premier letterhead for CoolWave treatments and competing treatments.  Neither one reported this to Urologix (doc. 8, Doerfert Declaration, ¶ 32.a-d., Exh. 12-15).  They used a Targis machine to perform additional treatments for Urologix customers and then deleted the records of the treatments from the primary directory on the machine (doc. 8, Ellis Declaration ¶¶ 2-11; Doerfert Declaration ¶ 34).[4] Bosque also performed additional treatments without reporting those treatments to Urologix for invoicing and proceeded to delete the entries from the primary directory (doc. 8, David Declaration ¶ 14-15; Achenbach Declaration ¶¶ 2-4; Ellis Declaration ¶ 13).[5]

_____

Declaration, Andrews Declaration).

[4] A control unit and field service manager for Urologix, recovered this data from the Targis unit assigned to Dr. M. Nazir Hamoui by logging in to a redundant file located in a back-up system that sales representatives and mobile technicians cannot access (doc. 8, Ellis Declaration ¶¶ 6-7).

[5] Eventually Urologix personnel recovered data from the Targis and CoolWave units assigned to Bosque and Dr. M. Nazir Hamoui showing the total value of the procedures that Bosque performed but did not report to be $11,015 (doc. 8, Ellis Declaration ¶¶ 6-7).  This figure represents the total value of treatments performed by Bosque but not reported to or invoiced by Urologix according to the chart set forth in the declaration of Sandra David (doc. 8, David Declaration, p. 5).  The $20,780 figure presented by David has been discounted to $11,015 due to

Subsequently, Bosque resigned from Urologix with his last day effective February 29, 2008.  On April 24, 2008, Bosque called Dr. Kenneth Essig's office manager to confirm an appointment scheduled for April 30, 2008, and representing that he would conduct the microwave procedure on behalf of Urologix even though he had started a new company and no longer worked for Urologix (doc. 8, McDuffie Declaration, ¶¶ 2-5).  After concluding her phone call with Bosque, Essig's office manager contacted Brent Williams, a Urologix sales representative, who informed her that Urologix had someone else scheduled to cover that appointment and confirmed that Urologix no longer employed Bosque (doc. 8, McDuffie Declaration, ¶ 7).

 After resigning their employment with Urologix, Wood and Bosque returned their laptops to Urologix.  Urologix discovered that both had deleted and permanently destroyed numerous files (doc. 8, Yerks Declaration ¶¶ 7, 8, 12).  A computer forensics expert identified more than 23,000 files deleted from Wood's computer and more than 4,000 files deleted from Bosque's computer (doc. 8, Andrews Declaration, Exh. 2).  The expert also identified five devices attached to Bosque's computer (including a 500 gigabyte external hard drive, three of which were attached the day after Bosque resigned), a reference to a removable USB storage device with the same serial number on both Wood's and Bosque's computers, and a user account deleted on Wood's laptop with evidence that the computer had been reformatted twice causing the destruction of the data on the computer rendering portions unrecoverable (*Id.*).  Confronted by this forensic analysis, both Wood and Bosque state that the information deleted from their

---

Dr. Hamoui's sworn statement that Bosque volunteered to help Dr. Hamoui and requested no compensation for the treatments performed by Bosque on 8/4/07, 9/8/07 and 12/12/07.

laptops "was personal information having nothing to do with [their] work at Urologix" (doc. 24, Wood Aff. ¶ 15; doc. 18, Bosque Aff. ¶ 4).

The majority of these events occurred during Urologix's third quarter, the period from January 1, 2008 through March 31, 2008.  During that time, Urologix lost approximately $164,500 in total revenue due to the loss of 30-40 accounts in that period (doc. 8, Schimmel Declaration ¶ 12).  That amount reflects the gross amount of revenue lost during the third quarter, but does not reflect any accounts lost during the period between July 1, 2007 and December 31, 2007 (Id.).  Urologix now moves to preliminarily enjoin Wood and Bosque from breaching their Employment Agreements and defrauding Urologix.

B.  Standard of Review

The decision to grant or deny a preliminary injunction is within the discretion of the district court.  *Carillon Importers, Ltd. v. Frank Pesce International Group Limited*, 112 F.3d 1125, 1126 (11th Cir. 1997).  In determining whether a preliminary injunction should issue, the district court considers whether the moving party has demonstrated (1) a substantial likelihood of success on the merits; (2) that the moving party will suffer irreparable harm unless the injunction issues; (3) the threatened harm to the movant outweighs the potential damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.[6]  *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d

_____

[6]  The Employment Agreements provide that they "will be governed and construed under the internal laws of the State of Minnesota, without regard to the conflict of laws principles of any jurisdiction" (doc. 8, Doerfert Declaration, Exh. 1, Section 7 and Exh. 2, Section 7).  While interpretation of the Employment Agreements are governed by Minnesota law, federal procedural law applies to determine whether the preliminary injunction should issue.  *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991).

1205, 1210 (11th Cir. 2003).  Since a preliminary injunction is an extraordinary and drastic

remedy, a district court should not issue a preliminary injunction unless the movant clearly

establishes the burden of persuasion as to each of the four prerequisites.  *Id.*

    *C.  Discussion*

        *1. likelihood of success on the merits*

            *a.  breach of contract*

Urologix claims Wood and Bosque breached their Employment Agreements by (1)

creating and operating a competing business while still employed by Urologix; (2) using or

disclosing confidential information; and (3) intentionally deleting files on their company-issued

laptops.  Wood's and Bosque's counter-arguments, that the provisions in the contract are

ambiguous and vague and that they did not violate the terms of their restrictive covenants, are not

particularly convincing.  In short, Urologix makes a strong showing and is likely to have success

on the merits of its breach of contract claims.

First, as Urologix contends, Wood and Bosque violated the restrictive covenants in their

Employment Agreements by creating and operating Premier, a business whose business plan

called for converting Urologix customers.  Further, Wood and Bosque invoiced Urologix

customers for both Urologix and competitors' treatments, such as the Prostiva treatment, on

Premier letterhead while still employed by Urologix.[7]

---

[7] The applicable provisions of the non-compete agreement provides:

**6.   RESTRICTIONS ON EMPLOYMENT**

    a.   Employee agrees that during his/her employment by Urologix and for a
period one (1) year immediately following the termination of his/her employment for
whatever reason he/she will not directly or indirectly render services to (including consulting

Wood attempts to justify owning and operating Premier by stating that he had already laid the ground work for an independent contractor agreement between Premier and Urologix while still employed by Urologix.  Basically, he argues that he decided to continue with his plan to create Premier as an entity providing treatments for BPH after the discussions between Urologix and Wood failed to establish an independent contractor agreement amenable to both parties.  The fact that Wood had initially planned to operate Premier as an independent contractor of Urologix did not provide Wood or Bosque free reign to operate Premier as a competitor of Urologix once the discussions regarding an independent contractor agreement failed.

Wood and Bosque also argue that they have not committed a breach of their non-competition provisions because the term "Competitive Product" as defined in the Employment Agreements is ambiguous and vague.  They claim that any ambiguity should thus be construed against the drafter, Urologix.  As it is defined in the Employment Agreements, "Competitive Product" includes "any product, process or service ... designed, developed, assembled, manufactured, marketed or sold by anyone other than Urologix and which is of the same general

---

or research), or acquire any kind of ownership in, any person or business organization that is engaged in the design, development, assembly, manufacture, marketing or sale of a Competitive Product that is sold, leased, or intended for use in any geographic area where Urologix actively markets a Urologix product or intends to actively market a Urologix product of the same general type or function...

  c.  Employee further agrees that during his/her employment with Urologix he/she will not plan, organize or engage in any business involving the design, development, manufacture, marketing or sale of any Competitive Product or conspire with others to do so.

  d.  Employee also agrees that during his/her employment and for one (1) year thereafter, he/she will not, directly or indirectly, solicit or induce any Urologix employee to leave the employ of Urologix, or hire any employee of Urologix or any former employee of Urologix within six months after the termination of that person's employment.

9

type, performs similar functions, competes with, is used for the same purposes or is intended for the same application as any Urologix product, process, service, or component thereof."  In treating BPH, Premier uses a CoolWave machine, radio frequency therapy and laser surgery. Wood and Bosque argue that radio frequency therapy and laser surgery do not constitute "competitive products" but different treatment options that depend on the medical status of the patient (doc. 24, Wood Aff. ¶ 2; doc. 28, Hamoui Aff. ¶ 9; doc. 23, Arnold Aff. ¶¶ 3-6).  In support of this argument, they offer the professional opinion of Dr. Paul M. Arnold, M.D. ("Dr. Arnold"), who distinguishes microwave therapies, such as the CoolWave therapy, from radio frequency therapy and laser surgery for the treatment of BPH (doc. 23, Arnold Aff. ¶¶ 4-6).  In distinguishing the different types of BPH treatments, Dr. Arnold mentions the Prostiva RF/TUNA ("Prostiva") in particular (*Id.* at ¶ 5).  On January 3, 2008, while Wood and Bosque still worked for Urologix, Premier performed a Prostiva Therapy at Watson Clinic LLP, a customer of Urologix, and invoiced the treatment for a total of $1,395 (doc. 8, Doerfert Declaration ¶ 32.d. and Exh. 15).  Dr. Arnold notes that the Prostiva treatment and the other treatments do not treat BPH in the same way as the CoolWave or Targis, but the distinctions he attempts to draw fall short.  These types of treatments, although procedurally different, represent products, processes or services that are of the same general type, that perform similar functions, compete with, are used for the same purposes or are intended for the same application as Urologix products, processes and services as stated in the definition of "Competitive Product"

contained in the Employment Agreements.  Thus, by operating Premier and performing the

Prostiva treatment as well as other BPH treatments using competitive products, Wood and

Bosque rendered services to and acquired ownership interests in a business that markets and sells

a competitive product as well as planned, organized, and engaged in a business involving the

marketing or sale of a competitive product in violation of the express provisions in their

Employment Agreements.  Accordingly, Urologix has shown a substantial likelihood of success

on the merits of its breach of contract claim with regard to the violation of the non-competition

provisions contained in Wood and Bosque's Employment Agreements to the extent those

provisions are enforceable.

 In Minnesota, courts have held restrictive covenants similar to those contained in Wood's

and Bosque's Employment Agreements enforceable.  While non-competition clauses have been

traditionally disfavored by Minnesota courts, a court may enforce a non-competition clause if it

serves a legitimate employer interest and is not broader than necessary to protect that interest.

*Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998).  In fact, where the restraints

present a just and honest purpose, protects the legitimate interest of the party in whose favor it is

imposed, proves reasonable between the parties, and does not cause injury to the public,

Minnesota courts would hold the restraints as valid and enforceable.  *Klick v. Crosstown State*

*Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 87 (Minn. Ct. App. 1985).  Even if the restraint proves

unreasonable, under Minnesota law, a court may "blue pencil" a contract, wherein a court may

take an overly broad restriction and enforce it only to the extent that it is reasonable.  *Id.* at 88;

*See also Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n.8 (Minn. 2002).

 Under Minnesota law, Wood's and Bosque's restrictive covenants serve a just purpose,

protect the legitimate interests of Urologix, are reasonable between the parties, and do not cause

injury to the public.  First, the restrictive covenants protect the reasonable interests of Urologix in

maintaining its customer base and confidential information pertaining to its customers, such as

their preferences and uses.  Second, Urologix has a legitimate business interest in protecting

itself from the loss of trade or customers through the actions of an employee by means of the

opportunity which the employment has given him.  *Webb Pub. Co. v. Fosshage*, 426 N.W.2d

445, 450 (Minn. Ct. App. 1988).  Next, the restraints are reasonable as to duration and may be

modified to make the geographic scope reasonable.  Minnesota courts analyze the reasonableness

of the duration of a restrictive covenant under one of two standards: (1) the length necessary to

obliterate the identification between the employer and employee in the minds of the employer's

customers, and (2) the length of time necessary for an employee's replacement to obtain licenses

and learn the fundamentals fo the business.  *Dean Van Horn Consulting Associates, Inc. v.*

*Wold*, 395 N.W.2d 405, 408-409 (Minn. Ct. App. 1986).  Urologix contends that the restrictive

covenants contained in Wood's and Bosque's Employment Agreements withstand scrutiny under

both tests, and Wood and Bosque do not argue otherwise.  Further, Minnesota courts have

consistently upheld restrictive covenants for a period of one year as reasonable.  *Overholt Crop*

*Ins. Service Co., Inc. v.* Bredeson, 437 N.W.2d 698, 703-704 (Minn Ct. App. 1989)(finding a

two-year restriction on direct competition reasonable); *Webb*, 426 N.W.2d at 450 (upholding an

eighteen-month restrictive covenant); *Dean Van Horn*, 395 N.W.2d at 409 (reducing the

restrictive covenant from a three-year period to a one-year period).  Although the duration

restrictions are reasonable, the restrictive covenant defines its geographic scope as "any

geographic area where Urologix actively markets a Urologix product or intends to actively

12

market a Urologix product of the same general type or function."  Clearly, the Court would not permit, nor could it enforce, a preliminary injunction covering a geographic scope of "anywhere in the world according to [Urologix's] whims" (doc. 14, p.8).  That being said, counsel for Urologix asserted on more than one occasion at the hearing that the injunction should only prohibit Wood and Bosque from selling Urologix and its competitors products and services in the area Wood and Bosque serviced while employed at Urologix.  At least one Minnesota court has found a restrictive covenant reasonable where the covenant limited its geographic scope to the areas in which the employee actually worked for the employer.  *See Overholt Crop Ins. Services Co., Inc. v. Bredeson*, 437 N.W.2d 698, 703 (Minn. Ct. App. 1989).  Therefore, the Court should limit the geographic scope to include only the regions covered by Wood and Bosque during their employment with Urologix.  Since the Court has the authority to "blue pencil" restrictive covenants under Minnesota law, limiting the preliminary injunction to the areas Wood and Bosque serviced while employees of Urologix would enforce the restraint to the extent it is reasonable.  Finally, as will be discussed more fully below, Wood and Bosque have not demonstrated that enforcement of the restrictive covenants will cause injury to the public interest.  Thus, the restrictive covenants are enforceable and Urologix has shown a substantial likelihood of success on the merits of its claim that Wood and Bosque engaged in conduct in breach of the non-competition provisions.

In addition to the claim of breach of the non-competition provisions, Urologix contends that Wood and Bosque breached the provisions of their Employment Agreements regarding

confidential information.[8]  Namely, Urologix argues that Wood and Bosque have breached and continue to breach their Employment Agreements by using or disclosing confidential information pertaining to customers' preferences and uses as evidenced by their selling Urologix and competitors' products and services to Urologix customers.  During the course of their employment with Urologix, Wood and Bosque obtained the specific knowledge of the identity, preferences, and purchasing habits of Urologix's customers.  Although Wood and Bosque could obtain every name of every urologist in the state by looking at the yellow pages, they could not, and, in fact, did not, obtain all of the unique characteristics and preferences of each urologist by looking through the yellow pages.  This information became known to Wood and Bosque by reason of their employment with Urologix.  They used that confidential information to provide treatments to Urologix customers to further the interests of Premier both during and after their employment with Urologix.  Therefore, Urologix has established a substantial likelihood of

---

[8]  The applicable provisions state:

### 4.    CONFIDENTIAL INFORMATION

a.    Employee agrees not to directly or indirectly use or disclose Confidential Information for the benefit of anyone other than Urologix, either during or after his/her employment by Urologix.  In this regard, Employee shall not directly or indirectly render services to any person or business organization where the Employee's service would involve the use or disclosure of Confidential Information for any purpose.

d.    Employee recognizes that Urologix has received, and in the future will receive confidential or proprietary information from third parties subject to a duty on Urologix's part to maintain the confidentiality of that information and to use it only for certain limited purposes.  Employee agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person or business organization, or to use it except as necessary in carrying out Employee's work for Urologix consistent with Urologix's agreement with any such third party.

14

success on the merits of a breach of the confidential information provisions based on Wood and Bosque's use of that confidential information to further Premier's interests.

Finally, Urologix contends that Wood and Bosque breached their Employment Agreements by intentionally deleting data before returning their company-issued laptops.[9] Wood and Bosque represent that they deleted only personal information from their laptops (doc. 24, Wood Aff. ¶ 15; doc. 18, Bosque Aff. ¶ 4). However, Urologix solicited the assistance of a forensics expert who determined that Wood deleted more than 23,000 files from his company-issued laptop, Bosque deleted more than 4,000 files from his company-issued laptop, a portable hard drive used for storing information was connected to Bosque's computer the day after his resignation, and a removable USB storage device was shared between Wood and Bosque's computers. In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). The intentional deletion of thousands of files from the laptops, the attachment of an external storage device to the laptop the day after resigning from employment with Urologix, and the sharing of external storage devices between Wood and Bosque tend to show bad faith on the part of Wood and Bosque. Therefore, an adverse inference

---

[9] The applicable provision provides:

**5.     UROLOGIX DOCUMENTS AND PROPERTY**

a.     All documents and tangible items provided to Employee by Urologix or created by Employee for use in connection with his/her employment by Urologix, are the property of Urologix and shall be promptly returned to Urologix upon termination of employment, together with all copies, recordings, abstracts, drawings, blueprints, notes or reproductions of any kind made from or about the documents and tangible items or the information they contain.

15

must be drawn against Wood and Bosque despite their statements that the information deleted

constituted only personal information.  Accordingly, Urologix has also shown a substantial

likelihood of success on the merits of their breach of contract claim regarding the intentional

deletion of data by Wood and Bosque.

### b.  fraud

Similarly, Urologix has demonstrated a substantial likelihood of success on the merits of

its fraud claim.  Under Florida law, a claim for fraud consists of (1) a false statement concerning

a material fact; (2) knowledge by the person making the statement that the representation is false;

(3) intent by the person making the statement that the representation will induce another to act on

it; and (4) reliance on the representation to the injury of the other party.  *Lance v. Wade*, 457

So.2d 1008, 1011 (Fla. 1984); *Larson v. Correct Craft, Inc.*, 537 F.Supp.2d 1264, 1267 (M.D.

Fla. 2008).  The intentional omission of a material fact may also constitute fraud.  *Ward v.

Atlantic Security Bank*, 777 So.2d 1144, 1146 (Fla. 3d DCA 2001).

Urologix contends that Wood and Bosque's intentional failure to report sales made to

Urologix customers and their misrepresentation to Urologix's customers that they continued to

act on Urologix's behalf while diverting payments to themselves constitutes fraud.[10]  In response,

---

[10]  As to Wood and Bosque misrepresenting themselves as Urologix employees after termination of their employment, McDuffie has described in detail her conversation with Bosque, which occurred on April 24, 2008, regarding an appointment scheduled with Urologix in April. In that conversation, McDuffie claims Bosque represented himself as an Urologix employee to her even though his last day as an Urologix employee had occurred on February 29, 2008.  In response, Bosque offers a blanket denial stating that he never told McDuffie or any other client that he still represented Urologix after he was no longer employed with the company (doc. 18, Bosque Aff. ¶ 3).  Wood also offers such a denial (doc. 24, Wood Aff. ¶ 11).  Given the conflicting evidence, Urologix has failed to demonstrate a substantial likelihood of success on the merits as to this issue.

Wood and Bosque argue that some of the treatments that Bosque failed to report to Urologix occurred as a result of free treatments offered to Dr. Hamoui (doc. 28, Hamoui Aff. ¶ 5)[11] and deny that they continued to inform customers that they worked for Urologix after their employment had ended (doc. 24, Wood Aff. ¶ 11, and doc. 18, Bosque ¶ 3).  Instead, they claim they made it very clear that they worked for Premier.

With regards to the unreported treatments, Urologix has listed eight treatments that were performed but not reported to or invoiced by Urologix.  While Bosque may have performed three of those procedures for free for Dr. Hamoui, Wood and Bosque offer no explanation for the remaining five treatments.  Further, Wood and Bosque do not address or explain the four invoices on Premier letterhead for both Urologix treatments and competing treatments that occurred while Wood and Bosque still served in their capacity as Urologix employees and that they did not report to Urologix for invoicing (doc. 8, Doerfert Declaration, Exh. 12-15).  Wood and Bosque's failure to report treatments performed for Urologix's customers to Urologix, an omission of a material fact, with the intent that Urologix not receive payment for those treatments and Urologix's reliance on those omissions to their detriment provides a substantial basis upon which Urologix can succeed on the merits of its fraud claim.

### 2. irreparable harm

The Court must next consider whether Urologix will suffer irreparable harm unless the injunction issues.  An injury is considered "irreparable" only if it cannot be undone through monetary remedies.  *Ferrero*, 923 F.2d at 1449.  A substantial loss of business may constitute

---

[11]  Dr. Hamoui specifically mentions only the procedures performed on 8/4/07, 9/8/07, and 12/12/07.   (doc. 28, Hamoui Aff. ¶ 5).

irreparable injury where, as here, the amount of lost profits is difficult or impossible to calculate. *Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 958 n. 2 (5th Cir. Unit B 1981).[12]   Further, the former Fifth Circuit has held that the loss of customers and goodwill constitutes "irreparable" injury.  *Ferrero,* 923 F.2d at 1449 (citing *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., Unit A, 1981)).

Even though Urologix has set forth the estimated amount of its lost revenue for its third quarter in the amount of $164,500, this figure may not represent the actual loss suffered as a result of Wood's and Bosque's activities.  As Wood and Bosque's counsel stated at the hearing, any allegations regarding damages incurred by Urologix are "speculative" at best.  Even so, Urologix also alleges that it has suffered irreparable harm because it has lost customers and a significant amount of goodwill.  Binding precedent has held these losses to constitute irreparable harm due to the difficulty, if not the impossibility, of quantifying the effects of the loss of customers and goodwill.  With that in mind, it seems clear that the actual and future harm suffered by Urologix as a result of Wood's and Bosque's activities may not be undone through monetary remedies.   Thus, based on the incalculable nature of the harm suffered by Urologix as well as the loss of business and goodwill, Urologix has met its burden with respect to irreparable harm.[13]

---

[12]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit  adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[13]  In addition, in Minnesota, irreparable harm may be inferred where a defendant has breached the terms of an otherwise valid restrictive covenant.  *See Thermorama, Inc. v. Buckwold*, 125 N.W.2d 844, 845-846 (Minn. 1964).  As stated previously, Urologix has shown the restrictive covenants are valid as well as met its burden of showing a likelihood of success on its breach of contract claims.

*3.  balance of harm*

Next, the Court must compare the harm to the parties caused by the issuance or non-issuance of a preliminary injunction.  Although Urologix, Wood and Bosque will all suffer harm, the balance of harm weighs in favor of Urologix.  As discussed above, Urologix has suffered and will continue to suffer irreparable harm due to its ongoing and threatened future loss of revenue, customers and goodwill.  This irreparable harm will continue into the foreseeable future if Wood and Bosque are permitted to continue to violate the terms of their Employment Agreements.

In contrast, Wood and Bosque must simply comply with the terms of the Employment Agreements they entered into with Urologix.  They must refrain from violating their Employment Agreements, from competing with Urologix in the proscribed area for a reasonable period of time, and from misusing or disclosing Urologix's confidential information.  In fact, in their Employment Agreements, Wood and Bosque expressly agreed to enforcement of the covenants contained in the contracts by an injunction issued against the employee and any other person concerned.[14]

While Wood and Bosque may suffer substantial harm in the form of lost income, they are not faced with a blanket restriction against practicing their trade and can mitigate their loss by soliciting new clients.  *See Digitel Corp. v. Deltacom, Inc.*, 953 F.Supp. 1486, 1498 (M.D. Ala.

---

[14]  The applicable provision provides:

> "***Remedies***: In addition to any other relief afforded by law, Employee agrees that Urologix may enforce the covenants contained in this Agreement by injunction issued against Employee and any other person concerned, it being understood that both damages and an injunction shall be proper modes of relief and are not to be considered as alternative remedies."

1996); *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, (S.D.

Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir. 1993). The issuance of an injunction may serve as an

impediment to their ability to earn some income but will not entirely preclude them from earning

a livelihood or operating their business. Wood and Bosque may still operate Premier and solicit

business from the public at large, as long as they do not solicit Urologix customers, do not use or

disclose confidential information obtained as a result of their employment with Urologix, or sell

a competitive product or service within the proscribed area during the period of the injunction.

Premier may continue to use the Urologix CoolWave machine in its possession with its

corresponding catheters or it may use any other lawfully obtained Urologix product to service

non-Urologix customers in any areas not proscribed by the preliminary injunction. Based on the

foregoing, I find that the balance of harm weighs in favor of Urologix.

### 4. *public interest*

Finally, the Court must determine whether the issuance of an injunction would prove

adverse to the public interest. Here, no public interest will be disserved by the issuance of a

preliminary injunction. It is well-established that claims regarding covenants not to compete,

confidentiality agreements, and trade secrets are allowed, despite their anti-competitive nature,

because companies such as Urologix need them to survive. *Unisource Worldwide, Inc. v. South

Central Alabama*, 199 F.Supp.2d 1194, 1215 (M.D. Ala. 2001).

Although Wood and Bosque contend that public policy disfavors granting of injunctive

relief against parties that have not breached their agreements, that argument fails in light of my

finding that Urologix established a likelihood of success on the merits of its breach of contract

claims. Similarly, their "parade of horribles" argument that the granting of this injunction will

open the door to the granting of future injunctions that prevent conduct not specifically limited by a restrictive covenant thus limiting competition for all must fail.  Wood and Bosque engaged in conduct expressly prohibited by the valid restrictive covenants contained in the Employment Agreements that they each agreed to and signed.  In addition, in their individual Employment Agreements, Wood and Bosque agreed to the enforcement of the covenants contained in the Employment Agreement by injunction issued against themselves and any other person concerned.  Since Wood and Bosque point to no legitimate public interest that would preclude issuance of a preliminary injunction, Urologix has met its burden with respect to the public interest.[15]

> 5.  *amount of security*

Pursuant to Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As with the decision to grant or deny a preliminary injunction, the amount of an injunction bond is within the sound discretion of the district court. *Carillon Importers,* 112 F.3d at 1127.

Urologix contends that the amount of security should not exceed $25,000 while Wood and Bosque contend that Urologix should provide security in the amount of $658,000 based upon Urologix's own account that it experienced revenue losses totaling more than $164,500 in only one quarter due to Wood and Bosque's alleged competitive activity.  However, at the hearing on this motion, counsel for Wood and Bosque argued that many of the alleged losses that Urologix

---

[15]  Urologix also bases its request for injunctive relief on claims of conversion and misappropriation of trade secrets.  In light of Urologix's breach of contract claims and fraud claim, I find it unnecessary to apply the test for a preliminary injunction those causes of action.

claims it incurred are "speculative" at best because they may not be attributable to any actions of Wood or Bosque. Therefore, the amount Wood and Bosque suggest significantly exceeds the amount necessary for the injunction bond. Accordingly, since Wood and Bosque provide no basis for the amount of security, I find Urologix's proposed bond of $25,000 reasonable.

### D. Conclusion

For the reasons set forth above, I hereby RECOMMEND:

1. Plaintiff's Motion for Preliminary Injunction (doc. 7) should be GRANTED.

2. Wood and Bosque should be enjoined and restrained, directly or indirectly, and whether alone or in concert with others, from:

a) selling competitive products, directly or indirectly, on their own behalf, or on the behalf of anyone else;

b) rendering any competitive services, directly or indirectly, on their own behalf, or on the behalf of anyone else;

c) retaining, using, disclosing or transmitting Urologix's confidential information, including but not limited to customer information and product and service usage information of Urologix customers and prospects obtained as employees of Urologix.

3. Wood and Bosque should not be prohibited from selling or rendering services using any lawfully obtained Urologix machines, equipment or devices.

4. The geographic scope should include only the regions covered by Wood and Bosque during their employment with Urologix. For Wood, the geographic scope includes the State of Florida, except the panhandle. For Bosque, the geographic scope includes the State of Florida and South Georgia.

5.  Within 30 days of the district court's order, Wood and Bosque should advise, in writing, all customers and prospects with whom they have done or tried to do business in 2007 and 2008 that they are not affiliated in any respect with Urologix.

6.  The preliminary injunction should remain in effect until disposition by the district court.

7.  The preliminary injunction should take effect upon Urologix's filing of a surety or cash bond in the amount of $25,000, approved by the Clerk of this Court.

IT IS SO REPORTED at Tampa, Florida on this 18th day of June, 2008.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) *(en banc).*

Copies furnished to:
Hon. James S. Moody
Counsel of Record

23